UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NATASHA HILDA NELSON,<br><br>                              Plaintiff,<br><br>v.<br><br>KATHLEEN ALLISON, et al.,<br><br>                              Defendants. | Case No.:  3:22-cv-00377-CAB-AHG<br><br>**REPORT AND RECOMMENDATION FOR ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS**<br><br>**[ECF No. 26]** |

Plaintiff Natasha Hilda Nelson ("Plaintiff"), a state prisoner proceeding *pro se* and *in forma pauperis*, filed a civil rights complaint pursuant 42 U.S.C. § 1983, alleging that Defendants Kathleen Allison, Connie Gibson, Marcus Pollard, Raquel Buckel, Everett Benyard, E. Garcia, Mary Ann Gleen, and L. Cohen (collectively, "Defendants") violated her rights under the First, Eight, and Fourteenth Amendments while she was incarcerated at Richard J. Donovan Correctional Facility ("RJD") in San Diego, California. ECF No. 21. Defendants filed a motion to dismiss, which Plaintiff opposes. ECF Nos. 26, 34. For the reasons outlined below, the Court **RECOMMENDS** that the District Judge **GRANT IN PART and DENY IN PART** the motion to dismiss.

## I.      BACKGROUND

In her amended complaint, Plaintiff alleges three separate causes of action. ECF No. 21. Counts 1 and 2 relate to her exposure to and contraction of COVID-19 at RJD in December 2020. Count 3 involves free exercise and religious accommodations for her Wiccan faith arising in December 2019.

On January 6, 2023, Defendants filed a motion to dismiss Plaintiff's complaint. ECF No. 26. Plaintiff timely filed her opposition on April 4, 2023. ECF No. 34. Defendants timely filed their reply on April 24, 2023. ECF No. 35. The Court finds the matter suitable for submission without oral argument pursuant to CivLR 7.1(d)(1).

## II.      FACTUAL ALLEGATIONS[1]

In Count 1, Plaintiff alleges Allison and Gibson violated both her Eighth Amendment right to be free from cruel and unusual punishment and her Fourteenth Amendment right to equal protection when they authorized the transfer of inmates from the California Institution for Men ("CIM") and San Quentin State Prison ("SQSP") to RJD, which is "classified by the California Department of Corrections and Rehabilitation [("CDCR")] as a high risk medical and transgender facility," in November and December of 2020. ECF No. 21 at 4. Plaintiff alleges Allison and Gibson did so "despite the advice and guidance from the Center for Disease Control and Prevention" ("CDC"), and in direct contravention of an order issued by California's Governor to "stop all transfers after [a] SQSP outbreak" and "CDCR's new COVID-19 policies and procedures, including the Movement Matrix[.]" *Id.* at 4–5. Plaintiff alleges RJD had "zero positive cases of COVID-19 among the inmate population" at the time, but Allison and Gibson knowingly ignored the risk and sanctioned the transfer of inmates from CIM, SQSP, and "other facilities with COVID-19 outbreaks" to RJD even after several transferees tested positive and without

---

[1] Because this matter is before the Court on a motion to dismiss, Plaintiff's factual allegations are accepted as true. See, e.g., *Hosp. Bldg. Co. v. Trs. of Rex Hosp.*, 425 U.S. 738, 740 (1976); *Soltysik v. Padilla*, 910 F.3d 438, 444 (9th Cir. 2018).

first placing them in isolation or quarantine. *Id*. As a result, Plaintiff, who is asthmatic and was "classified by medical as [] high risk[,]" together with hundreds of other inmates and numerous correctional staff, contracted the disease. *Id*. at 4–6. Specifically, Plaintiff explains that she contracted COVID-19 from an inmate transferred to RJD and subsequently housed in Facility A with Plaintiff, because that inmate had been permitted to freely intermingle with the RJD inmates. *Id*. at 5. As a result, Plaintiff alleges she suffered intense anxiety and worsened asthma and depression, feared she was going to die, had fluid in her lungs and difficulty breathing, and developed prediabetes. *Id*. at 6. Plaintiff contends Allison and Gibson acted with deliberate indifference to her health and safety, and violated her right to equal protection, because they "admitted that they did these transfers in an attempt to protect other inmates." *Id*. Plaintiff deduces that Allison and Gibson authorized the transfer of inmates from CIM, SQSP, and other institutions experiencing COVID-19 outbreaks "to create a herd immunity by infecting as many inmates as possible[.]" *Id*. at 7.

In Count 2, Plaintiff focuses on Pollard, Buckel, Benyard, Garcia, and Cohen, and alleges they too violated her Eighth Amendment rights by failing to enforce preventative correctional and health care policies in Facility A Housing Unit 1 to protect her and others from contracting COVID-19 in December 2020. ECF No. 21 at 8–14. Specifically, Plaintiff claims that on December 5, 2020, she was informed by an unidentified custody officer that multiple inmates on Facility A Housing Unit 1 who had recently transferred to RJD from CIM had tested positive for COVID-19. *Id.* at 8. At the time, Plaintiff claims RJD only had cloth face masks, provided inadequate cleaning supplies, failed to implement social distancing measures, allowed inmates who refused COVID-19 testing and who reported feeling sick to work in the central kitchen and distribute food trays throughout the housing units, and required inmates to congregate in pill lines instead of requiring nurses to pack medication for in-cell delivery. *Id.* at 8–9. Plaintiff alleges that on December 12, 2020, she personally complained to Benyard about the lack of and failure to enforce CDC and COVID-19 safety protocols, and Benyard ensured her he would notify Pollard, Buckel, and

Garcia of Plaintiff's concerns to ensure that all staff were enforcing the COVID-19 policies. *Id.* at 9–10. After inmates were issued KN-95 masks on December 16, 2020, which were not exchanged if they became damaged or soiled during "the height of the outbreak," Plaintiff alleges she and several fellow inmates again complained, but this time to Garcia. *Id.* at 10. Plaintiff reiterated many of the same complaints made to Benyard, additionally noting that inmates who had tested positive were being housed in the same housing units as inmates who had tested negative. *Id*. Plaintiff alleges Garcia explained that inmates and staff had a right to refuse testing. *Id.* When Plaintiff asked LVN Locke[2] why Pack N' Pass[3] medication distribution had not been implemented, Locke said it was due to Cohen's failure to declare a state of emergency, the prerequisite for nurses to utilize Pack N' Pass. *Id.* at 11. Plaintiff alleges she wrote to Cohen and Glynn regarding the crowded pill lines and lack of social distancing. *Id*. Plaintiff further alleges that C/O Rodriguez[4] told her while in the pill line that Pollard and Buckel "never even developed an emergency action plan [in case] the prison experienced a COVID-19 outbreak." *Id.* at 13.

On December 15, 2020, Plaintiff tested positive for COVID-19 and was told she would "being put on isolation status." ECF No. 21 at 11–12. At the time, Plaintiff claims 30 other inmates who had previously tested positive were also on isolation status, but none, including Plaintiff, were moved. *Id*. at 12. Instead, Plaintiff claims she and others were quarantined in their current cells. *Id*. When Plaintiff reported difficulty breathing, severe asthma attacks, vomiting, and headaches to the nursing staff, she claims they only "t[ook] [her] temperature and vital signs." *Id*. at 9. "No other treatment was ever provided or offered," and when Plaintiff inquired why her vitals were not being checked daily, she was

---

[2] LVN Locke is not named as a Defendant.

[3] "Pack N' Pass" refers to medication being placed in small envelopes and delivered to the inmates in housing units, and is utilized during lockdowns or emergencies. ECF No. 21 at 11.

[4] C/O Rodriguez is not named as a Defendant.

told she was "not on the list." *Id.* When an unidentified custody officer noticed Plaintiff was in respiratory distress and was coughing up fluid, they radioed for a Triage and Treatment Area ("TTA") emergency response team; however, an unidentified TTA nurse informed Plaintiff there was no bed space at the hospital and instructed Plaintiff to lay on her bunk, "try to get all the fluid out of her lungs," and "ride it out." *Id.* at 13–14. Plaintiff contends that Glynn and Cohen knew that Plaintiff was a medically "high risk inmate but they continued to knowingly ignore [her] pleas for medical treatment and help." *Id*. at 13. When Plaintiff filed a CDCR Health Care Appeal Form 602-HC "to try to obtain medical treatment," to force Glynn and Cohen to follow COVID-19 policies, and to report the "imminent threat to her health and safety" posed by her infection and the "ongoing refusal" of Pollard, Buckel, Garcia, Glynn, and Cohen to follow COVID-19 protocols, her appeal was classified as a "regular, non-emergency appeal." *Id.* at 12–13. Plaintiff claims this further endangered her health because "she could have died from not receiving medical treatment." *Id.* at 13.

In fact, Plaintiff alleges Pollard, Buckel, Benyard, and Garcia "continued to act with deliberate indifference and a wanton disregard for [her] health and safety by failing to correct the numerous problems that they had created," "even [held] a food sale fundraiser in the middle of the outbreak," and "allow[ed] outside visitors to come into RJD and pass out food." *Id*. at 13. She further contends Cohen "began to falsify and fabricate medical documents to make it look as if the Plaintiff was refusing medical COVID-19 treatment[.]" *Id.* at 14.

In Count 3, Plaintiff focuses on Allison, Gibson, Pollard, Benyard, and Buckel's alleged violations in 2019 of her First Amendment right to free exercise and her Fourteenth Amendment right to equal protection in the practice of her Wiccan faith.[5] ECF No. 21

---

[5] "The Federal Rules of Civil Procedure permit a party to 'join, as independent or alternative claims, as many claims as it has against an opposing party.'" *Garity v. APWU Nat'l Lab. Org*., 828 F.3d 848, 855 n.5 (9th Cir. 2016) (quoting Fed. R. Civ. P. 18(a)).

at 15–20.

Specifically, during the week of December 22–28, 2019, and between the hours of 11:30 a.m. to 1:00 p.m., when all inmates are restricted to their cells unless at work, participating in the Enhanced Outpatient Program's ("EOP") recreational therapy, or on C-status, Plaintiff contends that Pollard, Benyard, and Buckel authorized the Protestant Services Praise and Worship Team to enter all five housing units in Facility A and use instruments, microphones, and speakers to perform Christian worship songs. *Id.* at 15–16. On December 24, 2019, Plaintiff contends the songs, beginning with Amazing Grace, were "so loud that [they] drowned out [her] television," which was at maximum volume, and could be heard through her headphones. *Id.* at 16. Plaintiff claims she requested to be released to the outdoor religious grounds for the duration, but was denied and "was forced to attend the entire Christian service against her will[,]" in violation of the First Amendment. *Id.* Plaintiff explains that CDCR policy states that "inmates' attendance at any religious service is voluntary," and Pollard, Buckel, and Benyard were familiar with the policy. *Id.* at 15.

Plaintiff further alleges more generally that Allison and Gibson changed CDCR policy[6] with respect to religious practice groups so that any religion could use the same outdoor religious grounds. *Id.* at 16–17, 19. As a well-documented Wiccan practitioner, who has also been studying Odinism, Plaintiff claims the multi-faith use of these grounds desecrates them such that Odinists and Wiccans "cannot freely exercise and practice their respective religions." *Id.* at 16–17, 19–20. Plaintiff alleges that Defendants changed the policy "to intentionally stop the practice of the pagan religions." *Id.* at 17.

Plaintiff also contends that, while some beliefs are similar, Odinist and Wiccans "do not practice the same," yet Allison, Gibson, Pollard, Buckel, and Benyard "actively discriminate" against them by lumping the pagan traditions together, routinely cancelling

---

[6] Plaintiff alleges that Allison, Gibson, Pollard, Buckel, Benyard, and Garcia also created and issued a policy memorandum to that effect. ECF No. 21 at 18.

3:22-cv-00377-CAB-AHG

their religious services, and denying approval for religious holidays and banquets, wheelchair access, and the tools to care for their outdoor religious spaces. *Id.* at 17–19. For example, Plaintiff recounts that requests to hold a Yule banquet, which is a major religious festival for both Odinists and Wiccans, were denied, preventing "religious duties that can only take place during Yule." *Id.* at 17. As another example, Plaintiff recounts that certain pagan religious banquets and services were cancelled due to security concerns, while Christian services were permitted in the same time slot, despite lockdowns. *Id.* at 18. Further, Plaintiff explains that Native Americans are not required to share their outdoor grounds, are provided with tools, saunas, and sweat lodges, and perform religious fires, while Wiccans and Odinists are not afforded the same treatment. *Id.* at 19–20. Plaintiff notes that Wiccans are not provided with locker space for sacred items. *Id.* at 19. Plaintiff claims these policies violate both her First Amendment right to free exercise of her faith, and her Fourteenth Amendment right to equal protection because Defendants do not similarly "lump all the different Christian denominations together" or require Native Americans to share their outdoor grounds, and instead routinely allow Christian religious services and Native American rituals, i.e., "the Wiccans and Odinists are denied these religious rights while the same rights are being provided to []other religious groups[.]" *Id.* at 18–19.

### III. PARTIES' POSITIONS

Defendants contend that Plaintiff's complaint should be dismissed because Plaintiff failed to state a claim upon which relief can be granted and because Defendants are entitled to qualified immunity. ECF No. 26-1. Defendants argue that Plaintiff failed to state an Eighth Amendment deliberate indifference claim regarding her exposure to and contraction of COVID-19 because she did not adequately plead the objective or subjective prongs. *Id.* at 15. Specifically, Defendants contest Plaintiff's assertions that Defendants were responsible for the transfer of inmates, pill lines, and social distancing practices, arguing that Plaintiff did not sufficiently plead that Defendants acted maliciously or sadistically. *Id.* at 17, 20, 22, 23. Defendants note that Plaintiff's complaint shows that "there were

some COVID-19 protocols in place," and argue that Plaintiff does not allege these protocols were unreasonable, contending that an inadequate COVID-19 response does not rise to the level of deliberate indifference. *Id*. at 22–23. Defendants also argue that Plaintiff failed to state a Fourteenth Amendment claim regarding her COVID-19 exposure because Plaintiff did not adequately allege that Allison or Gibson were "involved in, or even aware of," the inmate transfers. *Id*. at 24. Defendants contend that Plaintiff also failed to state a First Amendment claim because, "to the extent that [Plaintiff] was 'forced' to listen to the Christian service, this would be at best an inconvenience to her and does not rise to a substantial interference in the tenants of her Wiccan beliefs[.]" *Id*. at 28. Defendants also argue that Plaintiff failed to state a First Amendment claim because she did not plead any facts regarding how the policy memorandum regarding outdoor religious grounds prevented her from engaging in her faith. *Id*. Defendants argue that Plaintiff failed to state a Fourteenth Amendment claim regarding her right to practice the Wiccan faith because she did not allege any personal involvement by Defendants in denying or cancelling Wiccan religious services. *Id*. at 26. Further, Defendants argue that Plaintiff failed to allege that Defendants' policy memorandum "was created intentionally or purposefully to discriminate against Plaintiff "in her Wiccan beliefs, or intentionally treated [Plaintiff] as a Wiccan, differently from others similarly situated to her (other Wiccans)." *Id*. Defendants also contend that they are entitled to qualified immunity regarding Plaintiff's COVID-19 claims because it was not clearly established that their COVID-19 response was constitutionally deficient. *Id*. at 31–32.

Regarding her COVID-19 claims, Plaintiff responds that she adequately alleged that Defendants "refused to follow their own COVID-19 policies, refused to properly train their agents on these policies, [and] refused to enforce their policies[.]" ECF No. 34 at 11–12. Plaintiff reiterates that Defendants knew of the excessive risk COVID-19 posed to Plaintiff's health and safety, made the deliberate choice to disregard the risk by refusing to follow their own COVID-19 policies, and, as a direct result, Plaintiff contracted COVID-19. *Id*. at 13. In response to Defendants' qualified immunity argument, Plaintiff responds

by citing numerous cases from this circuit where courts denied qualified immunity in cases with similar allegations. *Id*. at 12. Regarding her free exercise and religious accommodation claims, Plaintiff responds that she adequately alleged religious discrimination without any penological interest for doing so. *Id*. at 15. Plaintiff also recounts how she adequately alleged that the policies applied to Wiccans and Odinists were not applied to Christians, Jews, Muslims, or Native Americans. *Id*. Plaintiff also argues that she adequately alleged that she was forced to attend a Christian religious service against her will. *Id*.

In their reply, Defendants argue that Plaintiff's request for injunctive relief should be dismissed because Plaintiff has been transferred from RJD to California Medical Facility ("CMF"). ECF No. 35 at 2–3 (citing ECF No. 30, Plaintiff's notice of change of address). Thus, Defendant argues that, since Plaintiff was seeking injunctive relief from RJD's regulations, and since she is no longer housed at RJD "and has not indicated any facts that she intends to return to RJD," her requests for injunctive relief are moot. ECF No. 35 at 3. Defendants also contend that, though Plaintiff cited numerous "district court decisions to support her conclusion that Defendants are not entitled to qualified immunity for Eighth and Fourteenth Amendment COVID-19 related claims[,]" those district court cases did not create clearly established rights defeating qualified immunity, noting that Defendants would have needed to be on notice in November and December of 2020. *Id*. at 9.

## IV.   LEGAL STANDARD

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of the complaint. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). However, plaintiffs must also plead "enough facts to state a claim to relief that is plausible on its face." FED. R. CIV. P. 12(b)(6); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The plausibility standard thus demands more than a formulaic recitation of the elements of a cause of action, or conclusory

3:22-cv-00377-CAB-AHG

allegations, or naked assertions devoid of further factual enhancement. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Instead, the complaint "must contain allegations of underlying facts sufficient to give fair notice and to enable the opposing party to defend itself effectively." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011).

In determining whether a complaint states a claim to relief that is plausible on its face, factual allegations are accepted as true and construed in the light most favorable to plaintiff. *See, e.g.*, *Soltysik*, 910 F.3d at 444. However, the "tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678; *see also Chavez v. United States*, 683 F.3d 1102, 1108 (9th Cir. 2012) ("a court discounts conclusory statements, which are not entitled to the presumption of truth, before determining whether a claim is plausible"). Accordingly, after discounting any unsupported conclusory allegations, the factual allegations in the pleading, when accepted as true, need "only plausibly suggest an entitlement to relief." *Starr*, 652 F.3d at 1216–17 (internal quotation marks omitted).

*Pro se* litigants "must be ensured meaningful access to the courts." *Rand v. Rowland*, 154 F.3d 952, 957 (9th Cir. 1998) (en banc). When a plaintiff is appearing *pro se*, the court must construe the pleadings liberally and afford the plaintiff any benefit of the doubt. *See, e.g.*, *Hebbe v. Pliler*, 627 F.3d 338, 342 (9th Cir. 2010); *Karim-Panahi v. Los Angeles Police Dept.*, 839 F.2d 621, 623 (9th Cir. 1988). In giving liberal interpretation to a *pro se* complaint, however, the court is not permitted to "supply essential elements of the claim that were not initially pled." *Ivey v. Bd. of Regents of the Univ. of Alaska*, 673 F.2d 266, 268 (9th Cir. 1982).

## V.    DISCUSSION

Defendants seeks dismissal of Plaintiff's complaint: (1) because Plaintiff failed to state a claim upon which relief can be granted as to her Eighth and Fourteenth Amendment claims regarding her exposure to and contraction of COVID-19; (2) because Plaintiff failed to state a claim upon which relief can be granted as to her First and Fourteenth Amendment claims regarding religious accommodations for her Wiccan faith; and (3) because

Defendant is entitled to qualified immunity regarding Plaintiff's COVID-19 claims.[7] ECF No. 26-1. The Court will address each in turn.

### A. Deliberate Indifference regarding COVID-19 claims

#### 1. Legal Standard

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments." U.S. CONST. amend. VIII. The unnecessary and wanton infliction of pain constitutes cruel and unusual punishment. *Whitley v. Albers*, 475 U.S. 312, 319 (1986); *Estelle v. Gamble*, 429 U.S. 97, 105–06 (1976). As such, it is "cruel and unusual punishment to hold convicted criminals in unsafe conditions." *Youngberg v. Romeo*, 457 U.S. 307, 315–16 (1982); *see also Morgan v. Morgensen*, 465 F.3d 1041, 1045 (9th Cir. 2006) ("The Eighth Amendment's prohibition against cruel and unusual punishment protects prisoners not only from inhumane methods of punishment but also from inhumane conditions of confinement"). Thus, prison officials have a constitutional obligation to protect inmates from a "serious, communicable disease." *See Helling v. McKinney*, 509 U.S. 25, 32–34 (1993); *see also Hutto v. Finney*, 437 U.S. 678, 682–83 (1978) (affirming Eighth Amendment violation, in part, because prisoners were kept in crowded cells with others suffering from infectious diseases, such as hepatitis and venereal disease); *Andrews v. Cervantes*, 493 F.3d 1047, 1050 (9th Cir. 2007) (recognizing a cause of action under the Eighth Amendment and 42 U.S.C. § 1983 "premised on the danger of contracting various communicable diseases" from being housed with contagious inmates during a known "epidemic"). "It is clear that COVID-19 poses a substantial risk of serious harm to prisoners." *Patton v. Gastello*, No. 21-cv-6634-JFW-PLA, 2022 WL 18228258, at *4 (C.D. Cal. Oct. 26, 2022), *report and recommendation adopted*, 2023 WL 1931325 (C.D. Cal. Feb. 10, 2023); *see, e.g.*, *Fuller v. Amis*, No. ED-CV-21-127-SSS-AS, 2023 WL 3822057,

---

[7] Initially, Defendants also sought to dismiss Plaintiff's request for punitive damages for failure to plead sufficient facts. ECF No. 26-1 at 32–33. However, in their reply brief, "Defendants withdr[e]w their Motion to Strike Plaintiff's Claim for Punitive Damages and will defer the issue to summary judgment[.]" ECF No. 35 at 2.

at *4 (C.D. Cal. Apr. 13, 2023) (collecting cases).

To plead an Eighth Amendment claim, prisoners must allege facts sufficient to plausibly show that officials acted with deliberate indifference to a substantial risk of harm to their health or safety. *Farmer v. Brennan*, 511 U.S. 825, 847 (1994). The deliberate indifference standard involves an objective and subjective prong. First, the plaintiff must allege, in objective terms, a "sufficiently serious" deprivation. *Id.* at 834 (citing *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)); *Norbert v. City & County of San Francisco*, 10 F.4th 918, 928 (9th Cir. 2021) ("This requires the inmate to demonstrate conditions posing a substantial risk of serious harm that present an excessive risk to [his] health or safety.") (internal quotation marks omitted); *Hines v. Youseff*, 914 F.3d 1218, 1229 (9th Cir. 2019) (for the objective factor, noting that inmates must establish that it is "contrary to current standards of decency for anyone to be [] exposed against h[er] will"). Second, the inmate must allege the prison official "knew of and disregarded an excessive risk to inmate health or safety[.]" *Farmer*, 511 U.S. at 837. Put another way, a prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement only if he knows that inmates face a substantial risk of harm and disregards that risk by failing to take reasonable measures to abate it. *Id*. at 837–45.

## 2. Objective Prong

Defendant argues that Plaintiff has failed to meet the objective prong as to any defendant. ECF No. 26-1 at 15. The Court disagrees. As many courts have acknowledged, COVID-19 poses a substantial risk of serious harm. *See, e.g.*, *Fuller*, 2023 WL 3822057, at *4 (collecting cases and concluding that, "as to the objective element, there is absolutely no question that COVID-19 is a serious communicable disease that creates a substantial risk of serious harm"). Here, Plaintiff's allegations regarding the spread of COVID-19 at RJD due to inmate transfers and inadequate safety protocols meet the objective prong. *See, e.g.*, *Jones v. Pollard*, No. 21-cv-162-MMA-RBM, 2022 WL 706926, at *6 (S.D. Cal. Mar. 9, 2022) (denying motion to dismiss as to objective prong, explaining that a reasonable person could conclude that, given that "COVID-19 poses a substantial risk of serious

harm," housing inmates infected with COVID-19 with those who had tested negative was "contrary to the standards of decency").

As such, the Court recommends that Defendants' motion to dismiss be denied as to the objective prong of Plaintiff's deliberate indifference claims.

### 3. Subjective Prong

To satisfy the subjective standard, "[a] prison official may be held liable under the Eighth Amendment for acting with 'deliberate indifference' to inmate health or safety only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer*, 511 U.S. at 825. Under this standard, "prison officials who actually kn[o]w of a substantial risk to inmate health or safety may be found free from liability if they respond[] reasonably to the risk, even if the harm ultimately [i]s not averted." *Id.* at 844. *Farmer* makes clear that deliberate indifference "is shown adequately when a prison official is aware of the facts from which an inference could be drawn about the outstanding risk, and the facts permit us to infer that the prison official in fact drew that inference, but then consciously avoided taking appropriate action." *Disability Rts. Mont., Inc. v. Batista*, 930 F.3d 1090, 1101 (9th Cir. 2019); *see Farmer*, 511 U.S. at 837 ("the official must both be aware of the facts from which the inference could be drawn that substantial risk of serious harm exists, and he must also draw the inference.").

Defendants urge the Court to find that Plaintiff failed to satisfy the subjective prong as to all Defendants because no one "acted maliciously and sadistically" towards Plaintiff. ECF No. 26-1 at 15 (legal standard), 17 (Allison and Gibson), 20 (Cohen and Glynn), 22 (Buckel, Pollard, Glynn, and Cohen), 23 (Benyard and Garcia). The Court is unpersuaded. "The subjective prong of an Eighth Amendment violation requires a showing defendants acted maliciously or sadistically to cause harm only where prison officials are accused of use of excessive force, not, as here, where they allegedly failed to protect a prisoner." *Williams v. Pollard*, 21-cv-0055-CAB-BGS, 2022 WL 184552, at *8 n.3, *9–*11 (S.D. Cal. Jan. 19, 2022) (declining to use malicious and sadistic standard proposed by

defendants, and finding that warden met the subjective prong when he was aware of RJD personnel's failure to follow safety protocols when infected inmates were placed in cells with uninfected inmates); *compare Hudson v. McMillian*, 503 U.S. 1, 6–7 (1992) ("whenever prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is that set out in *Whitley*, whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm") *with Farmer*, 511 U.S. at 837 (holding that the mental state of deliberate indifference is equivalent to that of "reckless disregard," which requires a showing the prison official "know[s] of and disregard[s] and excessive risk to inmate health and safety.").

Instead, defendants can be found to be subjectively aware of a risk by the fact that the risk was obvious. *See Farmer*, 511 U.S. at 842 (noting that "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious."); *Berg v. Kincheloe*, 794 F.2d 457, 460–61 (9th Cir. 1986) (allegation that guard ignored obvious risk to prisoner's safety stated a prima facie cause of action under the Eighth and Fourteenth Amendments); *cf. Plata v. Newsom*, 445 F. Supp. 3d 557, 559 (N.D. Cal. 2020) ("no one questions that [the COVID-19 pandemic] poses a substantial risk of serious harm" to prisoners.)

Defendant argues that Plaintiff failed to meet the subjective prong as to any defendant. ECF No. 26-1 at 15, 17–23. The Court will address the Defendants in turn.

### i.  Allison and Gibson

Defendant Allison was the Secretary of CDCR during the time period of Plaintiff's allegations and Defendant Gibson is CDCR's Director of Institutions. *See* ECF No. 21 at 2. Plaintiff alleges Allison and Gibson authorized inmate transfers in direct contravention of CDC guidelines, California's Governor's order to "stop all transfers," and CDCR's own

/ /

/ /

/ /

COVID-19 policies.[8] *Id.* at 4–5; *see also id.* at 5 (Allison and Gibson "authorized and allowed their agents to transfer inmates to RJD"); *id.* at 6 (Allison and Gibson "made the deliberate choice to transfer inmates … and allowed their agents to carry out these transfers"). Plaintiff alleges that Allison and Gibson knowingly ignored the risks to medically high-risk inmates, like Plaintiff, when they sanctioned the transfer of inmates from CIM, SQSP, and "other facilities with COVID-19 outbreaks" to RJD—classified as a high risk medical facility—even after several transferees tested positive and without first placing them in isolation or quarantine. *Id.* at 4–5. Plaintiff contends Allison and Gibson acted with deliberate indifference to her health and safety, because they "admitted that they did these transfers in an attempt to protect other inmates." *Id.* at 6.

Defendants argue that Plaintiff fails to plead that Allison and Gibson had the requisite mental state. ECF No. 26-1 at 17. As discussed above, the Court rejects Defendants' contention that Plaintiff needed to plead "factual allegations that demonstrate Allison and Gibson acted maliciously and sadistically toward" her. *Id.*; *see Williams*, 2022 WL 184552, at *8 n.3. Further, the cases cited by Defendant, (*see* ECF No. 26-1 at 18), regarding failure to allege sufficient facts are not persuasive. *Compare Robinson v. Broomfield*, No. 21-cv-00972-RMI, 2021 WL 1192385, at *3 (N.D. Cal. Mar. 30, 2021) ("in his brief complaint … Plaintiff states that Defendants are liable for failing to protect

---

[8] Here, ignoring CDC Guidelines and Governors' executive orders to transfer inmates may also demonstrate deliberate indifference. *Compare Taylor v. Unknown*, No. 21-cv-0831-JAM-EFB-P, 2022 WL 2220936, at *1–*2 (E.D. Cal. June 21, 2022) (finding plausible deliberate indifference claim when sergeant approved transfer of COVID-positive inmates without testing first when "movement [of inmates] … was prohibited because of the pandemic") *and Ahlman v. Barnes*, 445 F. Supp. 3d 671, 691 (C.D. Cal. 2020) ("An institution that is aware of the CDC Guidelines and able to implement them but fails to do so demonstrates that it is unwilling to do what it can to abate the risk of the spread of infection. In other words, failure to comply demonstrates deliberate indifference toward the health and safety of the inmates") *with* ECF No. 21 at 5 (alleging "CDC provided the CDCR with guidance on the proper handling of COVID-19" and inmate transfers went afoul of CDC policies, the Governor's executive order halting transfers, and CDCR's Movement Matrix).

him [from COVID-19 and] provides no other information") *with* ECF No. 21 (detailed allegations that Allison and Gibson initiated transfers to RJD, a high risk medical facility, against the Governor's order, RJD's own protocols, and CDC guidelines). *Compare Fields v. CDCR*, No. 21-cv-0548-EFB, 2021 WL 1295079, at *2 (E.D. Cal. Apr. 7, 2021) (explaining that, to state a claim, plaintiff's amended complaint should include "(1) who was responsible for the transfer of the inmates; (2) who was responsible for choosing not to test the inmates prior to transferring them; (3) who was aware that plaintiff was in an "at risk" population; (4) what precautions, if any, were taken by prison officials to prevent plaintiff's exposure to the virus; and (5) how those precautions, if any, were inadequate and led to his infection.") *with* ECF No. 21 at 4–6, 8 (alleging that: (1) Allison and Gibson authorized the transfer of the inmates; (2) Allison and Gibson were responsible for choosing not to test or quarantine the transferees; (3) Allison and Gibson were aware that many inmates at RJD were high risk,[9] including Plaintiff; (4) mass testing occurred after the outbreak began; and (5) Plaintiff contracted COVID-19 after speaking with a transferee in the pill line of Facility A). *Compare Cooper v. Allison*, No. 20-cv-09415 BLF, 2021 WL 1700163, at *4 (N.D. Cal. Apr. 28, 2021) (noting that plaintiff named the CDCR Director, Secretary, and Governor as defendants, "but makes no factual allegations against them") *with* ECF No. 21 at 4–6 (factual allegations against Allison and Gibson). *Compare George v. Diaz*, No. 20-cv-03244-SI, 2020 WL 5073996, at *4 (N.D. Cal. Aug. 24, 2020) ("amended complaint alleges that plaintiff does not want to be transferred to a 'COVID-19

---

[9] Even if Plaintiff did not plead that Allison and Gibson were personally aware of her asthma diagnosis, "the increased risk of COVID-19 infection due [to] the placement of infected inmates among those not infected alone, absent underlying medical conditions, is objectively, sufficiently serious. So even without this specific knowledge [of Plaintiff's medical conditions], Plaintiff's allegations are sufficient to support the inference that Defendant knew of the heightened risk to Plaintiff of contracting COVID-19 and disregarded that risk." *See, e.g., Jones v. Pollard*, 2022 WL 706926, at *9; *cf. Berg*, 794 F.2d at 460–61 (allegation that guard ignored obvious risk to prisoner's safety stated a prima facie cause of action under the Eighth Amendment).

hotspot' but does not allege that prison officials actually have any plans to transfer him…. The amended complaint also alleges that COVID-19 is widespread in the CDCR but does not allege that the CDCR is not taking steps to address the disease") *with* ECF No. 21 at 4–5 (alleging Allison and Gibson were not taking steps to address the spread, such as by choosing not to test or quarantine transferred inmates, and by transferring inmates in violation of own policies).

Here, the allegation is not that Defendants "simply failed to prevent the spread of the virus or achieve measures not possible in a correctional setting; it is that they actively and knowingly made specific affirmative decisions that created a greater risk" that Plaintiff would contract COVID-19. *Cf. In re CIM-SQ Transfer Cases*, No. 22-mc-80066-WHO, 2022 WL 2789808, at *7, *10 n.14 (N.D. Cal. July 15, 2022) ("Plaintiffs have plausibly alleged that each of the defendants … participated, as supervisor or otherwise, in one or more of the decisions to transfer prisoners, regarding the process for transferring prisoners, and regarding the housing of prisoners after the transfer, in a manner that exposed plaintiffs to heightened risk of contracting COVID-19. These alleged actions are sufficient to constitute unconstitutional conduct"). For example, here, Plaintiff alleges that Allison and Gibson knew that RJD had many medically high-risk inmates, knew the risks of COVID-19, had authority to initiate inmate transfers, and failed to take protective measures to avoid an outbreak. "[T]here is a general consensus that a prisoner states a cognizable Eighth Amendment conditions of confinement claim if the prisoner sufficiently alleges that a defendant knew of the risks of COVID-19 and had authority to mitigate the risks, yet did nothing to mitigate those risks." *Jones v. Sherman*, No. 21-cv-1093-DAD-EPG-PC, 2022 WL 783452, at *7 (E.D. Cal. Mar. 11, 2022), *report and recommendation adopted*, 2022 WL 4238875 (E.D. Cal. Sept. 13, 2022). Here, the Court concludes that Plaintiff did just that.

Defendants argue that Plaintiff also fails to adequately plead that Allison and Gibson are liable as supervisors. ECF No. 26-1 at 18. This too is unpersuasive. Supervisory liability may exist without any personal participation if the official implemented "a policy so

deficient that the policy itself is a repudiation of the constitutional rights and is the moving force of the constitutional violation." *Redman v. Cnty. of San Diego*, 942 F.2d 1435, 1446 (9th Cir. 1991) (citations and quotations marks omitted), *abrogated on other grounds*, *Farmer*, 511 U.S. at 825. To prove liability for an action or policy, the plaintiff must "demonstrate that his deprivation resulted from an official policy or custom established by a … policymaker possessed with final authority to establish that policy." *Waggy v. Spokane County Washington*, 594 F.3d 707, 713 (9th Cir. 2010). When a defendant holds a supervisory position, the causal link between such defendant and the claimed constitutional violation must be specifically alleged. *See Fayle v. Stapley*, 607 F.2d 858, 862 (9th Cir. 1979); *Mosher v. Saalfeld*, 589 F.2d 438, 441 (9th Cir. 1978). However, as Plaintiff alleges here by repeatedly claiming that Allison and Gibson were the ones to authorize the transfers, the requisite causal connection can be established "by setting in motion a series of acts by others," or by "knowingly refusing to terminate a series of acts by others, which the supervisor knew or reasonably should have known would cause others to inflict a constitutional injury." *Starr*, 652 F.3d at 1207–08 (internal citations and quotation marks omitted).

As such, the Court recommends that Defendants' motion to dismiss be denied as to Plaintiff's deliberate indifference claim against Allison and Gibson.

### ii.  *Pollard and Buckel*

Defendant Pollard was RJD's Warden during the time period of Plaintiff's allegations and Defendant Buckel is the Chief Deputy Warden at RJD. *See ECF No. 21 at 2–3. Defendants argue that Plaintiff made bare allegations, at best, regarding Pollard and Buckel, likening Plaintiff's claims to those in other cases with generalized allegations regarding failures of social distancing. ECF No. 26-1 at 19. Though rooting an Eight Amendment claim solely on a warden's status as a warden does not provide a cognizable basis for liability, here, Plaintiff alleges much more specific allegations that do state a claim for relief. *See Jones v. Pollard*, 2022 WL 706926, at *7–*9 (granting motion to dismiss as to warden's "failure to control the spread of COVID-19 within RJD, generally, including

the allegations pertaining to the failure to provide appropriate masks" and denying motion to dismiss as to specific allegations regarding warden's affirmative decision to place inmates infected with COVID-19 in the mental health building where Plaintiff was housed).

Here, Plaintiff alleges that Pollard and Buckel did not ensure that "their agents were properly trained" to enforce preventative COVID-19 policies, explaining that RJD only had cloth face masks until the outbreak surged, with inmates and staff not wearing their masks correctly; provided inadequate cleaning supplies; failed to implement social distancing measures; allowed inmates who refused COVID-19 testing and who reported feeling sick to work in the central kitchen and distribute food trays throughout the housing units, and required inmates to congregate in pill lines instead of requiring nurses to pack medication for in-cell delivery. ECF No. 21 at 8–9. Plaintiff alleges that he notified Pollard and Buckel of the deficiencies four times, through an associate warden who told Plaintiff he would notify Pollard and Buckel about her concerns, and through two[10] Form 22's and one 602 Appeal submitted to Pollard and Buckel. Id. at 9–11. However, Pollard and Buckel did not take any steps to remedy the situation, and Plaintiff thereafter contracted COVID-19. Id. *Compare Jones v. Sherman*, 2022 WL 783452, at *7 (states a deliberate indifference claim when "defendant knew of the risks of COVID-19 and had authority to mitigate the risks, yet did nothing to mitigate those risks") *with* ECF No. 21 at 13 (Plaintiff was told by a correctional officer that "Pollard and Buckel never even developed an[] Emergency Action Plan [in] case the prison experienced a COVID-19 outbreak."). *Compare Jones v. Sherman*, 2022 WL 783452, at *2, *10–*11 (stated a deliberate indifference claim when

---

[10] It is unclear whether Plaintiff submitted one or two Form 22's. However, the Court liberally construes Plaintiff's complaint as alleging that she submitted two. *Compare* ECF No. 21 at 10 (on December 12, 2020, telling Benyard that she had already filed a 602 Appeal and a Form 22 to Pollard and Buckel) *with id*. at 11 (after KN-95 masks were distributed on December 16, 2020, submitting a Form 22 regarding sick inmates working in the kitchens to Pollard, Buckel, Benyard, and Garcia).

plaintiff alleged "Defendants allowed infected inmates that worked in the kitchen in Facility F to distribute daily meals to Plaintiff and other inmates") *with* ECF No. 21 at 13 (multiple notifications regarding, in part, risks of allowing inmates who reported feeling sick to work in the central kitchen and distribute food trays throughout the housing units).

The Court notes that, "[i]n examining whether a prison official subjectively acted with deliberate indifference to the risk of COVID-19, the key inquiry is not whether the official responded perfectly, complied with every CDC guideline, or completely averted the risk; instead, the key inquiry is whether she responded reasonably to the risk." *Fuller*, 2023 WL 3822057, at *4 (internal quotation omitted). Though Defendants argue that Plaintiff concedes that certain safety protocols[11] were in place—such as mass testing, cloth masks, and isolation—Plaintiff adequately alleges that these protocols were unreasonable. ECF No. 21 at 8 (mass testing occurred after outbreak had begun); *id.* at 10 (KN-95 masks distributed because "cloth mask[s] would not protect us from COVID-19," and were not exchanged if they became damaged or soiled during "the height of the outbreak"); *id.* at 11–12 (isolation policy was in name only, as neither Plaintiff nor 30 other inmates were not isolated after they contracted COVID-19); *id.* at 8–9 (Pollard and Buckel did not ensure that "their agents were properly trained"); *see, e.g.*, *Fuller*, 2023 WL 3822057, at *5 (plaintiff's allegations that defendant "knew that emergency protocols were necessitated by the COVID-19 pandemic, had authority to promptly assign an inmate to isolation after testing positive for COVID-19, and was responsible for training subordinate officers in the proper way to handle and retrieve the personal property of infected inmates, but failed to act to mitigate the risk of infection to Plaintiff" were sufficient to plead an Eighth

---

[11] *Compare Ahlman*, 445 F. Supp. 3d at 691 (noting that "[t]he amount of care required in a prison with no suspected [COVID-19] cases is far different than the amount of care required in an institution with hundreds of cases: one bar of soap a week may not be deliberately indifferent where there are no infections but it certainly is where—as here—there are hundreds of infected individuals with new cases daily") *with* ECF No. 21 at 9 ("the extra cleaning supplies we were told would be provided have never been issued and the regularly monthly issue ran out quickly").

Amendment claim).

Further, though Defendant argues that Plaintiff fails to state "what actions Pollard and Buckel specifically did or did not perform as a result of" Plaintiff's 602 Appeal or Form 22, of note, Plaintiff alleges that Pollard and Buckel illustrated their subjective deliberate indifference when they "h[eld] a food sale fundraiser in the middle of the outbreak and allow[ed] outside visitors to come into RJD[] to pass out food[.]" *Id*. at 13.

As such, the Court recommends that Defendants' motion to dismiss be denied as to Plaintiff's deliberate indifference claim against Pollard and Buckel.

### iii.  Glynn and Cohen

Defendant Glynn is the Chief Executive Officer at RJD and Defendant Cohen is a Senior Registered Nurse at RJD. *See* ECF No. 21 at 2–3. As discussed above, the Court rejects Defendants' contention that Plaintiff needed to plead "factual allegations that demonstrate … that Cohen and Glynn acted maliciously and sadistically for the very purpose of causing [Plaintiff] harm." ECF No. 26-1 at 20; *see Williams*, 2022 WL 184552, at \*8 n.3. Further, the out-of-circuit cases cited by Defendant, (*see* ECF No. 26-1 at 21), regarding reasonableness of mitigation are not persuasive, nor are the cases regarding warden liability.

For example, here, Plaintiff alleges that Pack N' Pass medication distribution had not been implemented because of Defendant Cohen's failure to declare a state of emergency, the prerequisite for nurses to utilize Pack N' Pass. ECF No. 21 at 11; *see also id*. ("it was [] Cohen's responsibility as the head of the nursing staff on Facility A to declare a state of emergency"). Thus, it follows that Cohen's failure to declare a state of emergency is, at least partially, to blame for the crowded pill lines, and Plaintiff contracted COVID-19 in a crowded pill line. *See Starr*, 652 F.3d at 1207–08 (causal connection can be established "by setting in motion a series of acts by others"). Plaintiff further alleges that Glynn and Cohen failed to "ensure that their agents were trained in and following the CDCR's COVID-19 policies[.]" ECF No. 21 at 13. Plaintiff alleges that she wrote to Cohen and Glynn regarding the crowded pill lines and lack of social distancing at the medical

clinic, and thereafter filed a 602 Appeal regarding Cohen and Glynn, but nothing changed, and inmates who had tested positive for COVID-19 continued to pick up their medications in the same pill-lines as those who had tested negative. *Id*. at 11.

Moreover, Plaintiff contends that Cohen, in her position as a medical professional, as well as Glynn, knew that Plaintiff, due to her asthma, was a medically "high risk inmate but they continued to knowingly ignore [her] pleas for medical treatment and help." *Id*. at 13. For example, when Plaintiff contracted COVID-19, nursing staff informed her that "she was not on the list" of inmates whose vitals needed to be checked. *Id*. at 12. Plaintiff alleges that Glynn and Cohen "were directly responsible to see that Plaintiff received medical treat[ment] and failed to do so[.]" *Id*. Plaintiff submitted CDCR Form 7362, "trying to obtain medical treatment," since nursing staff did not take her vitals, even though she was experiencing severe difficulty breathing, vomiting, and headaches. *Id*. at 12. Plaintiff next filed a CDCR Health Care Appeal Form 602-HC[12] to again "try to obtain medical treatment," to force Glynn and Cohen to follow COVID-19 policies, and to report the "imminent threat to her health and safety" posed by her COVID-19 infection, her appeal was classified as a "regular, non-emergency appeal," which allocated 60-days for the Appeals Office to respond. *Id.* at 12–13. Plaintiff claims this delay further endangered her health because "she could have died from not receiving medical treatment," since she had fluid in her lungs. *Id.* at 13. Plaintiff further contends that Cohen "began to falsify and fabricate medical documents to make it look as if the Plaintiff was refusing medical COVID-19 treatment[.]" *Id.* at 14. The Court notes that, "[s]tanding alone, a prisoner's allegation that records were falsified is not enough to state a cognizable claim of deliberate indifference to a prisoner plaintiff's serious medical needs." *Williams v. Navarro*, No. 18-

---

[12] It is unclear whether Plaintiff filed one or two 602 Appeals to Glynn and Cohen. However, the Court liberally construes Plaintiff's complaint as alleging that she submitted two. *Compare* ECF No. 21 at 11 (Plaintiff filed 602 Appeal regarding crowded pill-lines) *with id*. at 12 (Plaintiff filed 602-HC Appeal regarding her attempts to obtain emergent medical treatment after contracting COVID-19).

3:22-cv-00377-CAB-AHG

cv-1581-TWR-KSC, 2021 WL 2633630, at *3–*4 (S.D. Cal. June 25, 2021) (finding that plaintiff plausibly stated a claim for deliberate indifference when one of his many factual allegations was that the defendant falsified his medical records); *Green v. Branson*, 108 F.3d 1296, 1304 (10th Cir. 1997) (a "refusal to provide medical attention, … coupled with falsification of medical records," i.e., an attempt to cover up the refusal, supported a cognizable deliberate indifference claim). Here, accepting all allegations as true and construing claims in the light most favorable to Plaintiff, Cohen and Glynn's failure to provide medical treatment, despite her multiple requests, coupled with Cohen's alleged falsification of records, state a claim for subjective deliberate indifference.

Additionally, a "determination of deliberate indifference involves an examination of two elements: the seriousness of the prisoner's medical need and the nature of the defendant's response to that need." *McGuckin v. Smith*, 974 F.2d 1050, 1053 (9th Cir. 1992), *overruled on other grounds*, *WMX Techs v. Miller*, 104 F.3d 1133 (9th Cir. 1997). "Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.' [] A 'serious' medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain." *Id.* (internal citations and quotation marks omitted). Here, Plaintiff adequately alleges that Cohen and Glynn failed to timely provide medical treatment for her COVID-19 infection, despite her notifying them twice via Form 7362 and 602-HC Appeal, which caused her "intense fear and anxiety brought on by feeling [like] she was going to die," among other physical symptoms. ECF No. 21 at 12. Further, Plaintiff alleges that, after she recovered from COVID-19, she spoke with Cohen about the failure to enforce preventative health care policies, who said, "now that you've had COVID-19, you don't need to worry about it." *Id.* at 14. Construing the claims in the light most favorable to Plaintiff, Cohen's statement could show subjective deliberate indifference.

As such, the Court recommends that Defendants' motion to dismiss be denied as to Plaintiff's deliberate indifference claim against Glynn and Cohen.

#### iv.  *Benyard and Garcia*

Defendant Benyard is an Associate Warden at RJD and Defendant Garcia is a Captain at RJD. *See* ECF No. 21 at 3. Plaintiff alleges that Benyard and Garcia violated her Eighth Amendment rights by failing to enforce policies in Facility A Housing Unit 1 to protect her and others from contracting COVID-19. ECF No. 21 at 8–14. Plaintiff alleges that she, and approximately 30 other inmates, complained to Benyard on December 12, 2020, about RJD's COVID-19 safety protocol failures, including: inmates that had tested positive being housed in the same housing units as inmates that had tested negative, only providing cloth face masks and not requiring that those masks were worn correctly, overcrowded housing, providing inadequate cleaning supplies, failing to implement social distancing measures, allowing inmates who refused COVID-19 testing and who reported feeling sick to work in the central kitchen and distribute food trays throughout the housing units, requiring inmates to congregate in pill lines instead of requiring nurses to pack medication for in-cell delivery, and permitting unquarantined, untested transferees to "freely intermingle with those of us who had tested negative." *Id.* at 8–10. Plaintiff alleges that, "as the Facility A Associate Warden, it was ultimately [Benyard's] responsibility to ensure that [the staff] was enforcing and following the policies." *Id*. at 10. In response, Benyard told Plaintiff that he would notify the warden and deputy warden about Plaintiff's concerns, and have a conversation with Garcia and the staff of Facility A, noting that "it was Garcia's responsibility to ensure that staff and inmates were following the policies on Facility A as Garcia was directly responsible for Facility A." *Id*. at 9–10. A few days after the conversation, and during "the height of the outbreak," all inmates were issued KN-95 masks but they were not exchanged if they became damaged or soiled. *Id*. at 10. Nothing else changed. Plaintiff then sent a Form 22 to Benyard and Garcia regarding inmates being permitted to work in the central kitchen and satellite kitchen after they informed staff they felt sick, but Benyard and Garcia did not take any steps to remedy the situation. *Id*. at 11. Plaintiff and several fellow inmates again complained, but this time to Garcia. *Id.* at 10. Garcia responded that inmates and staff had a right to refuse testing, and no further actions

were taken by Garcia to ensure COVID-19 safety protocols. *Id.* at 10. In fact, Plaintiff alleges that Benyard and Garcia "continued to refuse to follow CDCR's COVID-19 policies, even holding a food sale fundraiser in the middle of the outbreak and allowing outside visitors to come into RJD[] to pass out food[.]" *Id.* at 13.

As discussed above, the Court rejects Defendants' contention that Plaintiff fails to state a claim because her "complaint fails to show Benyard and Garcia acted maliciously and sadistically, with a subjective intent to harm" Plaintiff. ECF No. 26-1 at 23; *see Williams*, 2022 WL 184552, at *8 n.3. Further, Defendants argue that, at most, "Benyard and Garcia may have been negligent if they became aware of certain protocols were not followed," contending that negligence would not suffice for deliberate indifference. ECF No. 26-1 at 23. Here, however, Plaintiff repeatedly contacted Benyard and Garcia with her concerns, in person and in writing, citing numerous COVID-19 safety protocols that were not being followed. ECF No. 21 at 8–11. Thus, Plaintiffs' allegations regarding Benyard's and Garcia's inaction and failure to respond state plausible claims for subjective deliberate indifference. *See, e.g.*, *Flourney v. Diaz*, No. 21-cv-01767-RBM-BGS, 2022 WL 4544715, at *4 (S.D. Cal. Sept. 27, 2022) (finding plausible claim for deliberate indifference when plaintiff spoke to warden about guards not wearing masks and warden failed to correct the guards' deficiencies, because plaintiff "plausibly allege[d] Pollard knew of and failed to respond reasonably to a substantial threat to Plaintiff's health"); *Williams*, 2022 WL 184552, at *8 n.3, *9–*10 (finding plausible claim for deliberate indifference when plaintiff submitted written grievance to defendant about guards housing inmates infected with COVID-19 with inmates who were not infected, explaining that plaintiff "plausibly alleged Defendant [] was aware Plaintiff faced an ongoing risk to his health arising from RJD officials failing to follow the safety protocols" and met subjective prong because defendant "had a duty to act to require RJD personnel to follow the safety protocols, and, knowing that Plaintiff faced an ongoing risk to his health from that ongoing failure, refused to act to stop the alleged non-compliance with the safety protocols"); *cf. Snow v. McDaniel*, 681 F.3d 978, 989 (9th Cir. 2012) (review of inmate grievance by warden and associate

warden was sufficient to show they were aware that inmate had a serious medical need for surgery and failed to act to prevent further harm), *overruled on other grounds*, *Peralta v. Dillard*, 744 F.3d 1076 (9th Cir. 2014).

Additionally, Defendants argue that "there is no causal link between Benyard or Garcia's response (or lack thereof) [and Plaintiff's] alleged harm." ECF No. 26-1 at 23. The Court disagrees. Here, there is a sufficient causal link between Benyard and Garcia's failure to respond to Plaintiff's repeated complaints of untested, unquarantined, ill-feeling inmates being permitted to "freely intermingle" with inmates who had tested negative, and Plaintiff contracting COVID-19 after speaking to two inmates who had recently been transferred from CIM, had not been tested or quarantined, and were freely intermingling in Facility A. ECF No. 21 at 8–13. *See, e.g.*, *Jones v. Pollard*, 2022 WL 706926, at *5 (plaintiff alleged that defendant made the mental health building the quarantine location for infectious inmates, which was deliberately indifferent to plaintiff's substantial risk of serious harm from contracting the virus, and the court explained, "while Plaintiff does not allege that Defendant personally participated in the movement and placement of COVID-19 infected inmates, he pleads a plausible causal connection").

Though Defendants contend their actions were reasonable, the Court disagrees. *Peyton v. Cates*, No. 22-cv-151-JLT-EPG-PC, 2022 WL 1430752, at *5 (E.D. Cal. May 5, 2022) ("a prison official's failure to follow measures recognized to prevent the spread of COVID can demonstrate 'deliberate indifference toward the health and safety of the inmates.' [] … The key inquiry is not whether the defendant perfectly responded, complied with every CDC guideline, or whether the efforts ultimately averted the risk; instead, the key inquiry is whether the defendant responded reasonably to the risk") (internal citations, brackets, and quotation marks omitted). As discussed above, though Defendants argue that they had instituted adequate COVID-19 protocols, such as testing and masking, the Court finds that Plaintiff's allegations regarding holding a "food sale fundraiser in the middle of an outbreak" and allowing outside visitors to come into RJD to pass out food, (*see* ECF No. 21 at 13), state plausible claims of plainly unreasonable conduct that could amount to

subjective deliberate indifference.

As such, the Court recommends that Defendants' motion to dismiss be denied as to Plaintiff's deliberate indifference claim against Benyard and Garcia.

### B.   Equal Protection for Transfer of Inmates

#### 1.  Legal Standard

The Equal Protection Clause of the Fourteenth Amendment requires that persons who are similarly situated be treated alike. *City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 439 (1985). A claim may be established in several ways. First, a plaintiff may establish an equal protection claim by showing that she was intentionally discriminated against on the basis of her membership in a protected class. *See, e.g.*, *Lee v. City of Los Angeles*, 250 F.3d 668, 686 (9th Cir. 2001). Second, a plaintiff may establish a claim by showing that the state is burdening a fundamental right for some persons but not others. *Short v. Brown*, 893 F.3d 671, 679 (9th Cir. 2018). Finally, a plaintiff may also establish a class of one equal protection claim by showing that similarly situated individuals were intentionally treated differently without a rational relationship to a legitimate state purpose. *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).

#### 2.  Discussion

##### i.  Allison and Gibson

Plaintiff alleges that Allison and Gibson knowingly ignored the risks to medically high-risk inmates, like Plaintiff, when they sanctioned the transfer of inmates from CIM, SQSP, and "other facilities with COVID-19 outbreaks" to RJD even after several transferees tested positive and without first placing them in isolation or quarantine. ECF No. 21 at 4–5. Because Allison and Gibson initiated these transfers to "protect other inmates" at the other facilities, at the expense of spreading COVID-19 at RJD, Plaintiff alleges that Allison and Gibson infringed on her right to equal protection, i.e., her right to be treated the same as other inmates. *Id*. at 6.

Here, Plaintiff does not adequately allege an Equal Protection claim because she does not purport to belong to a suspect class, and she does not sufficiently plead facts

demonstrating that Allison and Gibson intentionally discriminated against her. Additionally, even construed liberally, Plaintiff does not allege that similarly situated individuals were treated differently. *See* ECF No. 21 at 6 (conclusory allegation that transfers were meant to "protect other inmates"). In an attempt to liberally construe Plaintiff's claims, her allegations could be interpreted as seeking the same treatment as the transferees, i.e., to be transferred out of RJD when it had an outbreak, or seeking Allison and Gibson's "protection" at RJD with respect to COVID-19 safety protocols as a high-risk inmate. *But see* ECF No. 21 at 7 (also alleging that Allison and Gibson are not trying to protect inmates, and are instead attempting to create "herd immunity"). The Court, however, is not permitted to "supply essential elements of the claim that were not initially pled." *Ivey*, 673 F.2d at 268.

As such, the Court recommends that Defendants' motion to dismiss be granted as to Plaintiff's equal protection claim against Allison and Gibson. *See, e.g.*, *Taylor*, 2022 WL 2220936, at *2 (no plausible equal protection claim when COVID-positive inmates were transferred to plaintiff's housing area without testing first, because "plaintiff does not allege that any defendant acted with an intent or purpose to discriminate against him because of his membership in any protected class"); *Peyton*, 2022 WL 1430752, at *8–*9 (no plausible equal protection claim when defendants continued incarceration of plaintiff, a senior at higher risk for COVID-19 with overcrowded living conditions lacking many COVID-19 protocols, because plaintiff did not adequately allege that he was intentionally treated differently than similarly situated inmates).

### C.   First Amendment Free Exercise Claim

#### 1. Legal Standard

"[T]he Free Exercise Clause … requires government respect for, and noninterference with, the religious beliefs and practices of our Nation's people." *Cutter v. Wilkinson*, 544 U.S. 709, 719 (2005). Despite their incarceration, prisoners retain their First Amendment rights, including the right to free exercise of religion. *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987)). Incarceration itself, as well as legitimate correctional

goals or security concerns, may limit free religious practice, however. *Id.* at 348; *McElyea v. Babbitt*, 833 F.2d 196, 197 (9th Cir. 1987) ("The right to exercise religious practices and beliefs does not terminate at the prison door. The free exercise right, however, is necessarily limited by the fact of incarceration, and may be curtailed in order to achieve legitimate correctional goals or to maintain prison security").

To establish a free-exercise violation, plaintiffs must show that prison regulations or actions substantially burden their exercise of their religion by preventing their engaging in conduct or having a religious experience required by their faith. *Hartmann v. Cal. Dept. of Corr. & Rehab.*, 707 F.3d 1114, 1122–24 (9th Cir. 2013). To implicate the Free Exercise Clause, a prisoner must show that the belief at issue is both "sincerely held" and "rooted in religious belief." *Malik v. Brown*, 16 F.3d 330, 333 (9th Cir. 1994); *see also Shakur v. Schriro*, 514 F.3d 878, 884–85 (9th Cir. 2008) (noting the Supreme Court's disapproval of the "centrality" test and finding that the "sincerity" test in *Malik* determines whether the Free Exercise Clause applies). If the inmate makes her initial showing of a sincerely held religious belief, she must establish that prison officials substantially burdened the practice of her religion by preventing her from engaging in conduct that she sincerely believes is consistent with her faith. *Shakur*, 514 F.3d at 884–85.

### 2. Discussion

#### i. *Policy Change Regarding Outdoor Religious Grounds (Allison, Gibson, Pollard, Buckel, Benyard, and Garcia)*

Plaintiff alleges that Allison and Gibson changed CDCR policy and Allison, Gibson, Pollard, Buckel, Benyard, and Garcia created a policy memorandum that permitted any religion to use the same outdoor religious grounds. ECF No. 21 at 16–17, 19, 21. Though Defendants argue that Plaintiff's complaint "fails to plead any facts on how this policy memorandum burdened the practice of [Plaintiff]'s religion," (ECF No. 26-1 at 28), Plaintiff repeatedly claims that the multi-faith use of these grounds desecrates them such that Wiccans cannot freely exercise and practice their religion. ECF No. 21 at 16–17, 19–20; *see id.* at 17 (other religions calling different spirits to the outdoor grounds desecrates

the space, and "[s]uch desecration cannot be cleansed or made pure again … to practice her Wiccan faith"); *id.* (explaining that both the Odinists and the Wiccans "tried multiple different ways to try to make the Defendants' new policy work" but were unable to practice their religions because the "spirits became angry and turn[ed] against the practitioners [because] they fail[ed] to protect and keep their sacred space sanctified and clean of any other spirits").

As such, the Court recommends that Defendants' motion to dismiss be denied as to Plaintiff's Free Exercise claim against Allison, Gibson, Pollard, Buckel, Benyard, and Garcia. *See cf. Avery v. Beard*, No. 16cv0699-BTM-DHB, 2017 WL 1047571, at *4–*5 (S.D. Cal. Mar. 20, 2017) (dismissing defendants when plaintiff merely alleged that they were listed on the "cc" section of the policy memorandum regarding outdoor worship areas because receiving the memorandum alone was not enough to state a claim, as opposed to if they had created, adopted, or implemented the policy).

### ii. *Christian Worship Songs (Pollard, Buckel, and Benyard)*

Plaintiff claims that Pollard, Buckel, and Benyard authorized the Protestant Services Praise and Worship Team to enter all five housing units in Facility A and use instruments, microphones, and speakers to perform Christian worship songs so loudly that they drowned out Plaintiff's television and could be heard through her headphones. ECF No. 21 at 15–16. Plaintiff claims she requested to be released to the outdoor religious grounds for the duration, but was denied and "was forced to attend the entire Christian service against her will[,]" in violation of the First Amendment. *Id.* Defendants argue that Plaintiff failed to provide factual allegations to support her claim, and failed to allege any specific acts or conduct of Pollard, Buckel, or Benyard. ECF No. 26-1 at 28. However, Plaintiff alleges that Pollard, Buckel, and Benyard affirmatively "set the time slot" for the playing of Christian worship songs between the hours of 11:30 a.m. to 1:00 p.m., when all inmates are restricted to their cells unless at work, participating in EOP recreational therapy, or on C-status, i.e., when all inmates would be in earshot. ECF No. 21 at 15; *see id.* ("Pollard, Buckel, [and] Benyard [] knew that this would force the inmates that practiced non-

Christian religions to attend this Christian service"). Defendants also argue that, "to the extent that [Plaintiff] was 'forced' to listen to the Christian service, this would be at best an inconvenience to her and does not rise to a substantial interference in the tenants of her Wiccan beliefs[.]" ECF No. 26-1 at 28. Of note, Plaintiff alleges that listening to Christian "praise and worship songs … violate[s] her own religious beliefs and [would] turn the spirits against her." ECF No. 21 at 16; *see id*. at 15 (Wiccan beliefs are sincere, describing herself as a "well known practitioner of the Italian tradition[] of Wicca"); *id*. at 19–20 (noting that "Plaintiff is a well-documented practitioner of Wicca, … and [prior to incarceration] was a Third Degree Initiate of the Moonlake Coven"). Plaintiff twice requested that she be excused from the Christian service due to it conflicting with her Wiccan beliefs, but, due to the requirements that all inmates be in their assigned cells between 11:30 a.m. and 1:00 p.m., her requests were denied. *Id.*

Defendants argue that Plaintiff was required to allege that "the defendants burdened the practice of her religion by preventing her from engaging in conduct mandated by her faith" by interfering "with a tenet or belief that is central to religious doctrine." ECF No. 26-1 at 27 (brackets and citations omitted). However, the Ninth Circuit has rejected the requirement that the conduct be mandated by the prisoner's faith. *Shakur*, 514 F.3d at 884–85. Instead, "it is the sincerity of h[er] belief rather than its centrality that is relevant to the free exercise inquiry." *Id*. at 884 ("district court impermissibly focused on whether 'consuming Halal meat is required of Muslims as a central tenet of Islam,' rather than on whether Shakur sincerely believes eating kosher meat is consistent with his faith").

Here, when all the facts are presumed true and are construed in Plaintiff's favor, Plaintiff's allegations of being unable to leave her cell and unable to block out the Christian worship songs, even with headphones, coupled with the length of the musical interludes and Plaintiff's sincerely held Wiccan belief that listening to these songs would turn the spirits against her, are sufficient to "implicate[] the Free Exercise Clause." *Shakur*, 514 F.3d at 884–85 (where plaintiff claimed health effects from vegetarian, but non-Halal, diet "interfered with his religious activities" and he "sincerely believed he was personally

required to consume kosher meat to maintain his spirituality.").

As such, the Court recommends that Defendants' motion to dismiss be denied as to Plaintiff's Free Exercise claim against Pollard, Buckel, and Benyard.

### iii. *Routine Cancellation or Denial of Wiccan Religious Services (Pollard, Buckel, Benyard, and Garcia)*

In her complaint, Plaintiff alleges that Pollard, Buckel, Benyard, and Garcia "actively discriminate" against Wiccans by routinely cancelling their religious services and denying approval for religious holidays and banquets. ECF No. 21 at 17–19. Specifically, Plaintiff claims that Pollard, Buckel, Benyard, and Garcia cancel Wiccan services while permitting Christian services in the same time slot, cite security reasons for cancelling services while permitting Christian services to continue despite the purported security risks, and routinely deny requests to hold Wiccan banquets by "either refusing to approve them or simply by not signing their approv[al] in time." *Id*. at 18, 20. Plaintiff alleges that her Wiccan religious beliefs "dictate that she spend time in communion with nature outdoors [and] denying her that ability places a substantial burden on her as it angers the spirits … and can cause them to turn against her." ECF No. 21 at 18. Defendants argue that Plaintiff fails to make any specific factual allegations regarding Pollard's, Buckel's, Benyard's, or Garcia's personal participation[13] in denying, cancelling, or preventing Wiccans from holding their religious services. ECF No. 26-1 at 28–29.

---

[13] The Court notes that personal participation is not required when a Plaintiff is seeking injunctive relief. *Anderson v. Dzurenda*, No. 18-cv-00426-MMD-CLB, 2021 WL 4171710, at *6 (D. Nev. Sept. 14, 2021) ("Since Anderson is seeking injunctive relief, he does not need to allege Defendants' personal involvement in the First Amendment violation. Anderson only needs to identify the prison policy that violates the constitution and name the official that can 'ensure that injunctive relief is carried out, even if he was not personally involved in the decision giving rise to Anderson's claims.'") (brackets omitted) (quoting *Colwell v. Bannister*, 763 F.3d 1060, 1070 (9th Cir. 2014)). Here, as discussed below, since Plaintiff's claims for injunctive relief should be dismissed with leave to amend, the Court addresses Plaintiff's claims as if she was solely seeking monetary damages.

Plaintiff alleged that Pollard, Buckel, and Benyard authorized religious services on Facility A, such as the Christian worship service on Christmas Eve. ECF No. 21 at 15. Plaintiff also alleged that Garcia was "directly responsible for Facility A." *Id.* at 9. Plaintiff also alleges that Pollard, Buckel, Benyard, and Garcia created a policy memorandum regarding religious exercise in the outdoor grounds. *Id*. at 18. Thus, the Court finds that Plaintiff plausibly alleged that Pollard, Buckel, Benyard, and Garcia personally participated, in their roles involving approval of religious activities, in denying and cancelling Wiccan religious services. *See Uhuru v. Bonnifield*, No. 19cv10449-JVS-KES, 2022 WL 4587203, at *2–*3 (C.D. Cal. Sept. 13, 2022), *report and recommendation adopted*, 2022 WL 4554365 (C.D. Cal. Sept. 29, 2022) (finding that bare bones allegations that defendants were personally involved in denying requests to hold religious services and banquets were sufficient to state a claim under the free exercise and equal protection clauses, by liberally construing allegations and interpreting the denials as part of defendants' roles as members of the religious review committee).

As such, the Court recommends that Defendants' motion to dismiss be denied as to Plaintiff's Free Exercise claim against Pollard, Buckel, Benyard, and Garcia.

### D.   **Equal Protection for practicing Wiccan faith**

#### 1. **Legal Standard**

"The Equal Protection Clause . . . is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne*, 473 U.S. at 432. A prisoner is entitled "to 'a reasonable opportunity of pursuing h[er] faith comparable to the opportunity afforded fellow prisoners who adhere to conventional religious precepts.'" *Shakur*, 514 F.3d at 891 (quoting *Cruz v. Beto*, 405 U.S. 319, 321–22 (1972)). To avoid dismissal, a plaintiff must plausibly suggest the existence of a discriminatory intent. *Freeman v. Arpaio*, 125 F.3d 732, 737 (9th Cir. 1997); *see Hartmann*, 707 F.3d at 1122–24 ("Plaintiffs must allege facts plausibly showing that the defendants acted with an intent or purpose to discriminate against [them] based upon membership in a protected class") (internal quotation omitted). However, discriminatory intent can sometimes be inferred by the mere

3:22-cv-00377-CAB-AHG

fact of different treatment. *Sischo-Nownejad v. Merced Community College Dist*., 934 F.2d 1104, 1112 (9th Cir. 1991), *superseded on other grounds as explained in*, *Dominguez-Curry v. Nev. Transp. Dep't*, 424 F.3d 1027, 1041 (9th Cir. 2005); *see, e.g.*, *Am. Humanist Ass'n v. United States*, 63 F. Supp. 3d 1274, 1284 (D. Or. 2014).

### 2. Discussion

#### i. *Outdoor Multi-Faith Religious Grounds (Allison, Gibson, Pollard, Buckel, Benyard, and Garcia)*

Plaintiff alleges that Allison, Gibson, Pollard, Buckel, Benyard, and Garcia changed CDCR policy, by issuing a policy memorandum, so that any religion could use the same outdoor religious grounds. ECF No. 21 at 16–19. As a well-known Wiccan practitioner, having held the position of Third Degree Initiate of the Moonlake Coven, Plaintiff contends that her beliefs are sincere. *Id.* at 15, 19–20. Plaintiff claims the multi-faith use of the outdoor grounds desecrates them such that Wiccans cannot freely exercise and practice their religion. *Id.* at 16–17, 19–20. Plaintiff explains that Native Americans are not required to share their outdoor grounds with any other religious group. *Id.* at 19–20. Further, Plaintiff alleges that Defendants routinely denied the Wiccans "the tools necessary to care for the outdoor religious grounds," while providing the same tools "to the Native Americans so that the Native Americans could care for their grounds." *Id.* at 19. Plaintiff also alleges that Allison, Gibson, Pollard, Buckel, Benyard, and Garcia[14] "have denied Plaintiff the use of fire" in her outdoor Wiccan rituals, when fire is "an intricate part" of Wicca, "while allowing the Native American inmates to use it in their[s]." *Id.* at 20.

Defendants argue that Plaintiff failed to plead factual allegations that Defendants intentionally created the policy concerning the use of outdoor grounds to discriminate against Plaintiff, or intentionally treated Plaintiff differently *from other Wiccans*. ECF No.

---

[14] In her complaint, Plaintiff alleges that "all of the Defendants have denied Plaintiff the use of fire" in her rituals. Liberally construing Plaintiff's complaint, the Court interprets "all of the Defendants" as the defendants at issue in Count 3: Allison, Gibson, Pollard, Buckel, Benyard, and Garcia.

26-1 at 26. First, the Court notes that Plaintiff does allege that Defendants created the policy to intentionally discriminate. *See* ECF No. 21 at 17 (alleging that Defendants issued the policy memorandum "to intentionally stop the practice of the pagan religions"); *id*. at 18–19 (Defendants "are forcing [Wiccans, Odinists, Christians, Muslims, and Jews] to share religious grounds with each other knowing that these religions are not compatible and they cannot share a sacred space," explaining that "Defendants have instituted this policy in an attempt to increase violence [by] putting practitioners of different religions against each other"). Further, even if Plaintiff's allegations of intentional discrimination are not accepted as true and are deemed conclusory, here, discriminatory intent can be inferred by the mere fact of different treatment. *Freeman*, 125 F.3d at 737 (citing *Sischo-Nownejad*, 934 F.2d at 1112). Second, the similarly situated group Plaintiff is alleging was treated differently was not other Wiccans, but other religious groups, such as Native American inmates. *Henderson v. Hernandez*, No. 14cv1857-JST-PR, 2015 U.S. Dist. LEXIS 8773, at *3 (N.D. Cal. Jan. 23, 2015) (explaining that the equal protection clause "requires that an inmate who is an adherent of a minority religion be afforded a reasonable opportunity of pursuing his faith comparable to the opportunity afforded fellow prisoners who adhere to conventional religious precepts") (internal quotation omitted).

As such, the Court recommends that Defendants' motion to dismiss be denied as to Plaintiff's Equal Protection claim against Allison, Gibson, Pollard, Buckel, Benyard, and Garcia. *See cf. Avery v. Elia*, No. 11-cv-03341-JAM-JFM-PC, 2013 WL 4407266, at *4 (E.D. Cal. Aug. 14, 2013), *report and recommendation adopted*, 2013 WL 5315390 (E.D. Cal. Sept. 20, 2013) (denying defendants' motion to dismiss, finding that plaintiff stated an equal protection claim when he alleged that fire played a significant role in his religious practice and alleged that defendants acted with discriminatory intent when they permitted Native Americans to use fires and not Wiccans).

/ /

/ /

/ /

### ii. *Lumping Pagan Traditions Together and Denials of Religious Services (Pollard, Buckel, Benyard, and Garcia)*

Plaintiff alleges that, while some beliefs are similar, Odinists and Wiccans "do not practice the same," yet Pollard, Buckel, Benyard, and Garcia "actively discriminate" against them by "lump[ing]" the pagan traditions together and not similarly "lump[ing] all the different Christian denominations together." ECF No. 21 at 18–19; *see id*. at 17 ("Even the Odinists and Wiccans desecrated the outdoor religious grounds for the other group by calling different spirits" to the outdoor grounds); *id*. at 20 (Wicca and Odinism are not "compatible with each other" and many practitioners of both groups have stopped attending services due to the outdoor space being desecrated). Plaintiff pleads: (1) that she is a sincere practitioner of Wicca; (2) that, by lumping her, as a Wiccan, together with Odinists and other pagan traditions even though they have different religious practices; (3) which is different than how more traditional faiths are not lumped together; and (4) Pollard, Buckel, Benyard, and Garcia discriminated against Plaintiff. For example, Plaintiff alleges that Pollard, Buckel, Benyard, and Garcia routinely cancel Wiccan and Odinist religious services and deny approval for their religious holidays and banquets, while permitting Christian services and holidays. *Id*. at 18–19. Plaintiff recounts that certain pagan religious banquets and services were cancelled due to security concerns, while Christian services were permitted in the same time slot, despite lockdowns. *Id*. at 18; *see id*. (Pollard, Buckel, Benyard, and Garcia denied Wiccan and Odinist holiday banquets but approved Christian Kairos banquet during a lockdown).

Defendant argues that Plaintiff pleads no facts, "including any action or inaction" by Pollard, Buckel, Benyard, and Garcia. ECF No. 26-1 at 26. As discussed above, accepting Plaintiff's allegations as true and construing them in the light most favorable to Plaintiff, the Court finds that Plaintiff plausibly alleged that Pollard, Buckel, Benyard, and Garcia personally participated, in their roles involving approval of religious activities, in denying and cancelling Wiccan religious services, lumping them together with Odinists, while simultaneously permitting Christian services. *See Uhuru*, 2022 WL 4587203, at \*2–\*3.

Further, since discriminatory intent can be inferred by the mere fact of different treatment, Plaintiff states a claim. *See* ECF No. 21 at 18 (examples of Wiccan and Odinist services being cancelled and replaced with Christian services in same time slot and during lockdown).

As such, the Court recommends that Defendants' motion to dismiss be denied as to Plaintiff's Equal Protection claim against Pollard, Buckel, Benyard, and Garcia. *See Am. Humanist Ass'n*, 63 F. Supp. 3d at 1280, 1284 (denying motion to dismiss when defendant argued that plaintiff failed to allege discriminatory intent in Equal Protection claim, noting that "Defendants' actions need not be malicious, only motivated by the fact that plaintiffs hold a different set of religious beliefs" when plaintiff alleged he, as a Humanist, was being lumped together with Unitarian Universalists for a study group).

### E.   Request for Injunctive Relief

In her complaint, Plaintiff seeks a court order requiring Defendants to "create and follow COVID-19 policies," "stop moving or transferring inmates who are infected or at a place that is experiencing a COVID-19 outbreak," "create distinct grounds for Wiccans and Odinist[s,]" and "create policies similar to the Native Americans inmates for the Wiccans and Odinists." ECF No. 21 at 22. Defendants argue that Plaintiff's requests for injunctive relief should be dismissed because Plaintiff has been transferred from RJD to CMF. ECF No. 35 at 2–3 (citing ECF No. 30, Plaintiff's notice of change of address). Thus, Defendant argues that, since Plaintiff was seeking injunctive relief from RJD's regulations and since she is no longer housed at RJD, her requests for injunctive relief are moot. ECF No. 35 at 3. The Court agrees. *See, e.g.*, *Johnson v. Moore*, 948 F.2d 517, 519 (9th Cir. 1991) (per curiam) (if a prisoner has no reasonable expectation of returning to a facility following a transfer, his claims for injunctive relief are moot); *Darring v. Kincheloe*, 783 F.2d 874, 876 (9th Cir. 1986) (when there is "neither a 'reasonable expectation' nor 'demonstrated probability' that plaintiff will again return to the correctional facility, his claim for injunctive relief was moot); *cf. LeBlanc v. Tabak*, CV-16-03925-JLS-AFM, 2017 WL 10543665, at *16-17 (C.D. Cal. May 30, 2017) ("Because plaintiff's claims arose at

CSP-LAC, all defendants named in the Complaint are employed at CSP-LAC, the circumstances about which he complains pertain only to CSP-LAC, and plaintiff does not contend that he has a reasonable expectation of returning to that facility, any claims against the named defendants for injunctive relief are now moot because plaintiff is no longer incarcerated at CSP-LAC").

The Court recommends that, to the extent Plaintiff is seeking state-wide[15] injunctive relief, Plaintiff's requests for injunctive relief be dismissed without prejudice.

The Court recommends that Plaintiff's request for injunctive relief as to RJD be dismissed without prejudice as well. If Plaintiff is transferred back to RJD, or has a reasonable expectation of returning to RJD, Plaintiff may amend her complaint to reallege these injunctive relief claims.

### F.   Whether Plaintiff Should be Permitted to Amend her Complaint

If a complaint fails to state a claim but the defects could be cured, the court should provide leave to amend, especially if the plaintiff is *pro se*. *See Lopez v. Smith*, 203 F.3d 1122, 1130–31 (9th Cir. 2000) (en banc); *see also Cato v. United States*, 70 F.3d 1103, 1106 (9th Cir. 1995) (noting that "[a] pro se litigant must be given leave to amend his or her complaint, and some notice of its deficiencies, unless it is absolutely clear that the deficiencies of the complaint could not be cured by amendment").

Because Plaintiff is proceeding *pro se*, and because the Court cannot determine with certainty that Plaintiff will be unable to state a claim, the Court recommends giving Plaintiff the opportunity to amend her complaint to remedy the deficiencies in her Fourteenth Amendment COVID-19 claim and Request for Injunctive Relief.

The Court reminds Plaintiff, if the instant Report and Recommendation is adopted, Plaintiff's amended complaint must be complete by itself without reference to any previous version of his pleading—i.e., defendants not named and any claims not re-alleged in the

---

[15] Jeffrey Macomber was appointed Secretary of CDCR on December 12, 2022. *See* FED. R. CIV. P. 25(d).

amended complaint will be considered waived. *See* CivLR 15.1; *Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.*, 896 F.2d 1542, 1546 (9th Cir. 1989) ("[A]n amended pleading supersedes the original."); *Lacey v. Maricopa County*, 693 F.3d 896, 928 (9th Cir. 2012) (noting that claims dismissed with leave to amend which are not re-alleged in an amended pleading may be "considered waived if not repled").

## G. Qualified Immunity regarding COVID-19

### 1. Legal Standard

Qualified immunity shields a public official from a suit for damages if, under the plaintiff's version of the facts, a reasonable official in the defendant's position could have believed that his conduct was lawful in the light of clearly established law and the information the official possessed at the time the conduct occurred. *See Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). When determining whether a public official is entitled to qualified immunity, the inquiry is twofold. Courts have discretion to decide which step to address first. *Pearson*, 555 U.S. at 236. First, the Court must determine whether the plaintiff has alleged the deprivation of an actual constitutional right. *Id.* Second, the Court must determine whether the right was clearly established. *Id.* The determination of whether the law was clearly established "must be undertaken in light of the specific context of the case." *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled in part on other grounds*, *Pearson*, 555 U.S. at 236.

### 2. Discussion

Here, Defendants argue that they are entitled to qualified immunity as to Plaintiff's Fourteenth Amendment equal protection claim and Eighth Amendment deliberate indifference claim concerning her contraction of COVID-19. ECF No. 26-1 at 30. The Court will address each in turn.

#### i. *Fourteenth Amendment COVID-19 Claim*

The Court notes that "qualified immunity is generally a fact specific inquiry." *Patton*, 2022 WL 18228258, at *7 (citing *Saucier*, 533 U.S. at 201). Because the Court is recommending the granting of leave to amend regarding this claim—substantially because

Plaintiff has not alleged sufficient factual allegations against Defendants—such a fact intensive determination is inappropriate at this stage of the proceedings. *See id*. At the present time, the Court simply cannot determine whether Defendants' actions are shielded by qualified immunity because Plaintiff has failed to identify the specific actions or inaction of Defendants in her Fourteenth Amendment COVID-19 claim. *See Groten v. California*, 251 F.3d 844, 851 (9th Cir. 2001) ("a Rule 12(b)(6) dismissal is not appropriate unless we can determine, based on the complaint itself, that qualified immunity applies"). Therefore, the Court recommends that Defendant's motion to dismiss Plaintiff's Fourteenth Amendment COVID-19 claims on qualified immunity grounds be denied without prejudice at this time. *See Patton*, 2022 WL 18228258, at *7 (denying without prejudice defendant's motion to dismiss on qualified immunity grounds because it had granted defendant's motion to dismiss for failure to state a claim); *Esparza v. Baca*, No. 07-cv-4119-PSG-OP, 2010 WL 4536786, at *12 (C.D. Cal. Aug. 31, 2010), *report and recommendation adopted*, 2010 WL 4530364 (C.D. Cal. Oct. 29, 2010) (declining to address qualified immunity defense when it had dismissed plaintiff's complaint with leave to amend, explaining that "[g]iven the Court's ruling on the other issues herein, such a fact intensive determination is inappropriate at this stage of the proceedings").

### ii.  Eighth Amendment Deliberate Indifference Claim

Defendants argue that they are entitled to qualified immunity under the second prong because there is no clearly established right to be free from heightened COVID-19 exposure and, likewise, there was no clearly established law that prohibited the transfer of COVID-positive inmates from one prison to another. ECF No. 26-1 at 30. Defendant urges the Court to narrowly define the right at issue. *Id*. At 30–32. Plaintiff argues that Defendants are not entitled to qualified immunity, contending that there is a right to be protected from heightened exposure to serious communicable diseases. ECF No. 34 at 12.

Here, Defendants' claims of qualified immunity rely on too narrow a definition of the clearly established right at issue. "Though a court must not define a right at a high level of generality, [] an official's 'legal duty need not be litigated and then established disease

by disease or injury by injury.'" *In re CIM-SQ Transfer Cases*, 2022 WL 2789808, at *9 (quoting *Estate of Clark v. Walker*, 865 F.3d 544, 553 (7th Cir. 2017)).

In their motion, Defendants discuss *Hines*, presenting it as an analogy to COVID-19, explaining that the Ninth Circuit found "the right to be free from heightened exposure to Valley Fever" was not a clearly established violation of the Eighth Amendment. ECF No. 26-1 at 31–32 (citing *Hines*, 914 F.3d at 1226–27). The Court, however, finds *Hines* distinguishable. For example, in *Hines*, the Ninth Circuit found that "[s]ince the prisoners are confined together, it is especially important that Valley Fever is not contagious." 914 F.3d at 1226–27. The court noted that "no societal consensus has emerged that the risk [of contracting Valley Fever] is intolerably grave," such that a reasonable officer would not necessarily know that housing individuals together in a region known for Valley Fever violated the Constitution. *Id.* at 1232. "In contrast here, COVID-19 is highly contagious, is not bound to a geographic area, and a societal consensus has emerged regarding its danger. There is no dispute that this virus presents a sufficiently substantial risk of harm … and it should come as no surprise to Defendants that they have a duty to protect [inmates] from exposure to COVID-19." *Maney v. Brown*, No. 20-cv-570-SB, 2020 WL 7364977, at *6 (D. Or. Dec. 15, 2020).

At this stage in the proceedings, the Court "cannot agree that defendants were not on notice that their conduct might violate the Constitution." *In re CIM-SQ Transfer Cases*, 2022 WL 2789808, at *9. For example, existing precedent clearly establishes the right of an inmate to protection from heightened exposure to serious communicable disease. *See, e.g.*, *Helling*, 509 U.S. at 33  (finding prison officials may not "be deliberately indifferent to the exposure of inmates to a serious, communicable disease" under the Eighth Amendment); *see also Hutto*, 437 U.S. at 682–83 (affirming a finding of an Eighth Amendment violation where a facility housed individuals in crowded cells with others suffering from infectious diseases, such as Hepatitis and venereal disease, and the individuals' "mattresses were removed and jumbled together each morning, then returned to the cells at random in the evening"); *Andrews*, 493 F.3d at 1050 (recognizing a cause of

action under the Eighth Amendment and 42 U.S.C. § 1983 for an alleged policy of not screening inmates for infectious diseases—HIV, Hepatitis C, and Heliobacter pylori—and for housing contagious and healthy individuals together during a known "epidemic of hepatitis C"); *accord Loftin v. Dalessandri*, 3 F. App'x 658, 663 (10th Cir. 2001) (recognizing an Eighth Amendment claim for knowingly housing the defendant in a cell with individuals who had tested positive for tuberculosis).

Accordingly, the Court recommends that Defendant's motion to dismiss Plaintiff's Eighth Amendment COVID-19 claims on qualified immunity grounds be denied without prejudice at this time. *See Keates v. Koile*, 883 F.3d 1228, 1235 (9th Cir. 2018) ("If the operative complaint contains even one allegation of a harmful act that would constitute a violation of a clearly established constitutional right, then" granting qualified immunity on a motion to dismiss is prohibited) (internal quotation marks omitted).

## VI.   CONCLUSION AND RECOMMENDATION

The Court submits this Report and Recommendation to United States District Judge Cathy Ann Bencivengo under 28 U.S.C. § 636(b)(1) and Local Civil Rule 72.3 of the United States District Court for the Southern District of California. In addition, **IT IS HEREBY RECOMMENDED** that the Court issue an Order: (1) approving and adopting this Report and Recommendation, (2) directing that Defendants' Motion to Dismiss for failure to state a claim be **DENIED** as to Plaintiff's First Amendment claims, Eighth Amendment claims, and Fourteenth Amendment Wiccan faith claims; (3) directing that Defendants' Motion to Dismiss for failure to state a claim be **GRANTED** as to Plaintiff's Fourteenth Amendment COVID-19 claims; (4) directing that Defendants' Motion to Strike Plaintiff's request for punitive damages be **DENIED AS MOOT without prejudice**; (5) directing that Defendants' Motion to Dismiss Plaintiff's request for injunctive relief be **GRANTED without prejudice**; (6) directing that Defendants' Motion to Dismiss be **DENIED without prejudice** as to Defendants' qualified immunity defense to Plaintiff's COVID-19 claims, and (7) directing Plaintiff, if she still wishes to pursue injunctive relief

3:22-cv-00377-CAB-AHG

or her Fourteenth Amendment COVID-19 claims, to file an Amended Complaint that remedies the deficiencies discussed above.

**IT IS HEREBY ORDERED** that any party to this action may file written objections with the Court and serve a copy on all parties no later than **August 18, 2023**. The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any Reply to the Objections shall be filed with the Court and served on all parties no later than **August 28, 2023**.

The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's Order. *See Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153, 1157 (9th Cir. 1991).

**IT IS SO ORDERED.**

Dated:  August 4, 2023

Honorable Allison H. Goddard
United States Magistrate Judge

3:22-cv-00377-CAB-AHG